May it please the Court, I'm Robert Jobe and I'm appearing today on behalf of the Petitioner, Balbir Singh. Although the immigration judge found Mr. Singh's testimony not credible, he never attempted to justify his adverse credibility finding by pointing to inconsistencies in Mr. Singh's testimony. Say that again. He never pointed to any inconsistencies in Mr. Singh's testimony. But he found them incredible. He did. He did. He based his adverse credibility finding really on two lines of reasoning. First, he said that Mr. Singh simply doesn't know how the police learned that he was raising money for Kali Dalman while he was in the United Arab Emirates, and he didn't know how the police had come to learn that he had returned to India. Well, in that, isn't there sort of an inherent inconsistency in that Mr. Singh, I mean, nobody had any basis to show why he would be singled out when, as he pointed out, pains were taken to make sure his name, when the payments were made, his name, those were destroyed, his name was removed, there was nothing illegal about it. Isn't that sort of an inconsistency to think that as soon as he shows up, or not as soon as he shows up, but that the authorities take him into custody? And I'm not sure there weren't inconsistencies relative to the, at least pointed out, relative to the injuries and the travel, et cetera. There, I think the immigration judge did point out inconsistencies, correct? Well, I don't believe those are inconsistencies either. What he said there is that... Well, there's different problems with that, I agree with you. Yeah, and I want to address those in turn. But on this issue about whether he's lying because he doesn't know how the police operate, I mean, on that, I would direct the Court first to pages 164, 165 of the statute. On this point, everybody in the courtroom, the government lawyer, the judge, Mr. Singh's own counsel, everybody agreed that any answer he gave as to how the police learned what they learned would be entirely speculative. In fact... Well, not necessarily. I mean, he might actually know. Right. So asking the question doesn't surprise me in the slightest. Precisely. I would agree with that. But here it's undisputed that the police never told him how they learned. He didn't know. He said throughout, I don't know. And the judge asked him to speculate. And on page 165, it says, the question, how do you think they knew that you were a supporter of Akali Dalman? The government objects. The government says it's calling for speculation. And then Judge Simpson says, yes, it's calling for pure speculation at this point, but we do a lot of speculating in this courtroom in cases such as this. And then he invites him to speculate. And the bottom line is, the guy doesn't know how the police learned this information. He can speculate, but you can't find him to be a liar simply because you find his information inadequate. When we all agree, it's pure speculation. Well, I mean, few people have been in more immigration cases than you have. You know how the system works and how inherently you're in a situation where almost only one person in the room actually has first-hand knowledge. Everybody else is reaching in the dark. And so it's a world of speculation. And you would expect somebody who lived through it, who presumably would have thought about it, to be able to answer some of the questions that nobody else has any information on. Some things are just not knowable, you know? I mean, for somebody who's arrested, who's not expecting to be arrested. He's raising money for this political party. He goes back to India to visit his family. And then out of the blue, police come, knock on his door, drag him to a police station and start questioning him. But isn't the upshot of this, whether we take, you know, the Convention Against Torture, et cetera, usually it's only the person who's claiming asylum that knows what happened, whether they indeed were harmed, whatever. And officials or people who are running the hearings, the IJ, is called upon to make credibility calls. I mean, that happens in all cases, basically. Juries make credibility calls. There may be no explanation. That's one of the things you take into consideration. But are you saying that we cannot give any deference to the credibility call or can't agree with it simply because we don't see that we think it was incorrect because there might have been speculation? I'm saying you can't find him not credible for not knowing something that he's not in a position to know. Take it a step further. Because I don't think that's where it ends. I mean, I understand what you're saying with regard to the pure speculation he has no control over what the police do and so forth, although I think he would probably give a lot of thought to it. But you're right. That's outside of his knowledge. The other element that struck me as being peculiar here was his medical condition and travel. I mean, he describes pretty serious beating, pretty serious injuries. There's no written confirmation, no corroboration of the treatment that he said he received in India. He leaves the country quickly. Well, you may have a point that he's got reason he wants to get out. But he gets out quickly in a condition that makes it hard to see how he travels exactly. He gets home to Dubai. No medical treatment there whatsoever. And that doesn't really seem consistent with what he's described in terms of his injuries and his treatment. Yeah. The questioning as to what sort of medical treatment he got when he returned to Dubai was sparse. Do you mind keeping your voice up? Yes, Your Honor. I apologize. The questioning as to what medical treatment he received when he returned to Dubai was sparse. But the immigration judge, his focus was on the fact that he was able to travel so quickly after having been brutalized like this. That's what he found inherently implausible. And at that point, I think it's just simply unfounded. And I'd like to walk through that scenario real briefly if I could because When you say it was unfounded, he described the situation, all of the alleged beatings were five to seven minutes, being hung by his heels. He was beaten several times. He left. He couldn't identify the injections or the tablets. At least I didn't see anything identifying what they were. I don't believe he was asked to identify them. Whether or not he was. What I'm saying is there's nothing in the record to indicate what those were. Now, granted, he said he was taken to the plane on a wheelchair and did rest up, I think, one evening before he went, wasn't it? Right. Right. But then, as Judge Clifton points out, we know nothing later. Has he taken off the plane on a gurney? We have no information that he gets medical treatment. And, yes, he may not have been asked, but one would have anticipated that in order to demonstrate the seriousness of what had occurred, he would have come forth with that information about ongoing treatment, which one would have expected. I'm not aware of any curative powers of an airplane. In fact, to the contrary. I'm not sure. Suddenly we have no information of any. And you're saying, well, he wasn't asked this. It would seem to me that trying to, in the position he was in, he would be emphasizing every single bit of treatment, of care, of whatever, and suddenly it all goes away. No, it didn't all go away. No mention of it. Right. But he testified he wasn't bleeding. He had no broken bones, as far as we can tell. He had a lot of bruises. But he had to be on a wheelchair to get to the plane. He was in great deal of pain. He was unable to walk because of the pain. Right. And was under medication, including injections. Right. And then we get off the plane and we hear nothing more. Right. Exactly. So where's the substantial evidence that he's not telling the truth? I mean, we hear nothing more. But the question is, does that undermine his, when you said there's no inconsistencies, the I.J. said that kind of undermines the credibility. I would expect that with those kinds of injuries, he would have sought treatment when he got here. He didn't come forward. Nothing happens. It almost seems like, look, I'm going to talk about how horrible it was there, but you would expect that he would explain what were his injuries, what were the nature of his injuries, what was diagnosed. Right. Nothing happens. Insofar as you're saying he should have come forward, that's not the law of this circuit. The law of this circuit is that if an immigration judge is going to find a man incredible who's applying for asylum based on some perceived inconsistency like that, he has to give him an opportunity to explain it. Well, I don't see that opportunity here. Well, the law also is we don't reverse the judge unless they're, unless we're compelled to do so. Yes. There has to be... That's the statute now. True. At the same time, there has to be substantial evidence supporting the immigration judge's adverse credibility finding. And here, there's nothing. All we have is pure speculation by the immigration judge, pure speculation where, in a situation where the applicant was never given an opportunity to respond to this particular issue that you're raising. So you're saying that your client could not have given it, that anybody prevented him from getting that opportunity? No. That's not my point. All right. My point is something different. At this point, I would direct the court to the authority in the Second Circuit. I agree with their position. If there's a perceived inconsistency that's raging, you know, then perhaps the immigration judge doesn't have to affirmatively raise it. But if the judge perceives some sort of an implausibility here that is not a raging implausibility, it's not apparent to everybody in the courtroom. No. The judge has an obligation to raise it. Wait. The judge gave him a chance to explain what happened to him and what his injuries were. Are you saying that the I.J. had to sit there and say, okay, now, when you got off the plane, what happened then? Were you hurt then? He gave him a chance to explain all of the nature of his injuries. He didn't do it. Or at least may not have done it. All he said. Excuse me. Yes. I'm sorry, Your Honor. But the I.J. said, look, I got some explanation, but it doesn't jive. That's not how I read the immigration judge's decision. I read the immigration judge's decision as focused on the inherent implausibility that he would have been able to board a plane and travel back to India, given that he was beaten one day before. In terms of the issue you're raising about what treatment he received, the only evidence in the record, I believe it's on page 186, where he says when he returned, he received country medicine. And he said, I have no problem with receiving country medicine. I'm a guy with a fifth grade education. That kind of medicine is okay with me. But in terms of his ability to board the plane, you have to keep in mind that he was threatened by the police one day earlier that if he was ever seen again by a police officer, he would be killed. Of course, notwithstanding his injuries, at that point, he chose to board the plane. Well, the problem is what you're explaining is there are different interpretations that could be given. And I'll grant you that. But you're asking us to reject the I.J.'s interpretation and assuming almost no deference, and I'm not sure I see how we get to that point where we can say clearly there was no basis whatsoever for that determination. I'm out of time. But if I could just respond to that, Your Honor. I mean, I think there's a huge difference between inconsistencies. The guy says one thing here and he says something different here. That's not what happened in this case. Judge Simpson conceded that there are no such inconsistencies. He didn't contradict himself at all. What he's saying is his testimony is inherently implausible. It's inherently unbelievable. And in that, yes, the court has a greater role to play because what may seem implausible to Judge Simpson may in fact be entirely plausible. And the fact that this guy accepted country medicine, yeah, somebody in his situation with a fifth-grade education living in his circumstances might well accept the treatment of country medicine. That doesn't mean he's a liar. It just means he's different from you and me. Thank you. May it please the court. My name is Marie-Flore Kwame. I'm an attorney for the U.S. Department of Justice Criminal Division and I'm here to represent the United States government, the respondent in this case. It is the view of the U.S. government that the two most salient issues in this case are whether Mr. Singh firmly resettled in the United States with the United Arab Emirates and assuming no firm resettlement, whether his testimony was credible. On the first issue, is that really still an issue? Well, if he's... I mean, everybody concedes it was due to employment. Isn't that correct? And the burden has now shifted to the... To the petitioner, yes. Right. And the U.S. government was addressing this position just because in the reply brief the petitioner mentions that he would like to remain to the immigration judge. And in light of the page 316 of the record where we have a residence visa and in light of the Abdallah decision which was cited by the Maharaj case, the Ambang decision, it's the position of the government that the Abdallah case, which is exactly, which mirrors the facts of petitioner, 20 years in the United Arab Emirates, Maharaj says that if you have stayed, if you have a visa stamped on your passport, which is the case on page 316 of the record, translated on page 354, if you have a visa stamped on your passport, that is direct evidence that you received an offer of permanent resettlement. And so the U.S. government would like to point this fact to the court. And if there is permanent resettlement, then it's a mandatory bar, but it's a presumption and the presumption shifted to petitioner and here petitioner did not rebut this presumption adequately. I'm sorry, I'm not quite following you. You're saying the fact that he has a passport is the requisite proof of an offer of permanent residence? No. On page 316 of the record, there's a picture of his passport. Right. And there is a visa. On that page, there is a stamp that says residence in English on it. And it's the same type of visa that Mr. Abdallah had in the United Arab Emirates. And this type of stamp, the Abdallah decision, which was cited by the Maharshi case, says that when you have, when the government presents this type of direct evidence, it says that it means that the U.S. government has satisfied its threshold burden of finding permanent resettlement. But is it clear here that the I.J. essentially applied the correct burden of proof? You know, was the proceeding below on the correct burden of proof? As to who had the burden of proving the permanent status, in effect, or the? The I.J. cited this Exhibit 15 in his decision on page 67 of the record, and mentioned this stamp. And the record also has this residence visa. And you're saying that is sufficient? Is that enough to show that he was firmly resettled? Yes, that's enough to show that. That shows that the, according to the Mahara decision, it's direct of, it's a proof of direct evidence. But what I'm concerned about is at the time of the hearing, it seemed like the burden had been, which is now shifted, had been placed on the individual to show, to show he was not firmly resettled. Now the burden is the other way. And I think both sides concede that his residence, first of all, that he went to India a good deal. And that his residence there was not really permanent in nature, at least that's the suggestion I get from the record, but was instead solely based on his retaining his employment status. And when, as he put it, that, I've forgotten the words, but went down the drain, he had to make plans to get out of the UAE. Well, that's, that's the position of petitioner, that he was a guest worker. But when you look at Abdallah, Abdallah says when you have a visa that has the words residence on it, it means that government rallied, made a prima facie case of firm resettlement. Well, there's also evidence that, that he had his, he had papers that indicated he was allowed to stay in the Emirates for a term and required a sponsor. But it was a term that was, had been renewed for 24 years. The fact that it has to be renewed suggests it's not permanent. That he has not been offered permanent residence. His residence is dependent upon his continuing to be employed. He keeps renewing it, but it's for a limited term. Yes, but the regulation says an offer, some type of offer of permanent resettlement. So the fact that it had been renewed, that it had to be renewed doesn't mean that he was not But that's not an offer of permanent, but by its terms almost, that's not an offer. That's an offer, in essence, isn't that akin to a month-to-month tendency? No, when you look at Abdallah, that was exactly the situation in Abdallah. He had the same type of visa as Abdallah. In the Maharaj case on Banksy, when on page 972 of the Maharaj case, it clearly says when you have this type of visa, as you have in Abdallah, it means it's direct evidence that the U.S. government can provide to satisfy its threshold burden. I'm citing page 972 of the Maharaj on Banksy. It cites Abdallah, and Abdallah is exactly like the situation of Petitioner here in this case, Your Honor. I would like to also address if I'd like to ask you one question. If he could not be deported to Saudi Arabia, could he be deported to India? I'm sorry, Your Honor, could you repeat this? Could you please repeat? I didn't hear the question. I'm sorry. If he cannot be deported to Saudi Arabia, can he be deported to India? The immigration judge, if he cannot be reported to the United Arab Emirates, he could be reported to India because the immigration judge did not find him credible. And I would like to address some of the What's your answer? Did you answer yes or no or what? Yes, he could be deported to India. Would we have to send it back to have that happen? Yeah, he could be sent back to India. But we couldn't do it, could we? We cannot issue the deportation orders. I would have to check the regulation on that and submit. I think that's fairly clear. The courts of appeals don't deport people. No, no. Okay, I thought you meant the DHS. Sorry. We would have to remand if that was going to happen. I would submit I would like to check the law on that and get back to the court and submit the letter. Thank you for the shot at it. Yes. On the credibility issue, the immigration judge found that the story that the petitioner gave had some troubling aspects. And I would like to cite a few cases from this circuit which is that an immigration judge has the right to exercise common sense in matters of credibility. Well, hold it. We're aware of that. But what about counsel's point? Let's take for example the conclusion that there was no credibility to the story about the injuries. The I.J. was not a doctor, right? That I'm aware of. Did the I.J. have any medical training? No. But the case law of this circuit, Your Honor, yes, the I.J. didn't have any medical training. But in matters of immigration... Indicating that... No objective facts. Indicating that the story that was told about the nature of the injuries, being put on the plane in a wheelchair, resting up, taking the medications, was not true. This was pure conjecture by the I.J. who had no medical training and didn't inquire as to exactly what the nature of the injuries were. I mean, one can say, yes, an I.J. can resolve conflicting facts, but this is an area that requires some expertise and the I.J. didn't have it and no witness there had it, did they? The immigration judge is entitled to exercise common sense and to have concerns. No, no, this isn't common sense. This is a question of medical determination. In the light of the totality of the circumstances, when you look at the fact that he wasn't a leader, Your Honor, in the ADM, he wasn't even a member... Well, that's a different issue. I understand you're talking now about the question of whether or not there was any rationale provided for why he would have been manhandled, if you will, when he got back to India. But I'm going back to the other issue that the I.J. found and that I discussed with counsel, and that is, for example, on the medical aspect, there was no basis for the I.J. to make that determination, was there? There wasn't a credibility call. That required expert testimony. The I.J. noticed that the story was consistent but had concerns and needed corroboration to the extent available. And that was something that the petitioner did not address. And the I.J. was very specific and said, you know, I would like to have a little bit more information about what happened. For instance, the medical records would help. Because in light of all of the different circumstances, the fact that the abuse that he alleged had been described in the Amnesty International reports, the fact that it's not illegal to contribute to the organization, the fact that he wasn't a leading member, and the fact that he was just a local police in Punjab, not the central Indian police who had been, who had arrested, allegedly arrested him. All the I.J. was saying, okay, I hear your story but just give me a little bit more. And he did not come and he wasn't forthcoming and that's on the basis of this fact that the I.J. decided that he was not credible. Thank you. Thank you. We thank both counsel. The case just argued is submitted. And the next case on this morning's calendar is Burke v. Gonzalez.
judges: Noonan, Clifton: Schiavelli